# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| VICTOR LAMOND JORDAN, SR., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. |
| | : | 3:22-cv-701 (CSH) |
| v. | : | |
| | : | |
| DEPARTMENT OF CORRECTION; | : | |
| ROLLIN COOK, COMMISSIONER; | : | |
| ANGEL QUIROS, DEPUTY | : | |
| COMMISSIONER; | : | |
| GIULIANA MUDANO, WARDEN; | : | |
| ROGER BOWLES, WARDEN; | : | |
| SOLOMON BAYMON, DEPUTY | : | |
| WARDEN; | : | |
| GREGORIO ROBLES, UNIT | : | |
| MANAGER; | : | |
| DARREN CHEVALIER, UNIT | : | |
| MANAGER; | : | |
| BLACKSTOCK, CAPTAIN; | : | |
| JACKSON, CAPTAIN; | : | |
| BETANCES, LIEUTENANT; | : | |
| LEONE, OFFICER; | : | |
| FRAYNE, DR.; | : | |
| SCOTT MUELLER, DR.; | : | |
| DAVID MAIGA, DIRECTOR OF | : | |
| POPULATION MANAGEMENT; | : | |
| JOHN DOE 1, LIEUTENANT; | : | |
| JOHN DOE 2, OFFICER; | : | |
| JOHN DOE 3, OFFICER; | : | |
| JOHN DOE 4, OFFICER; | : | **MARCH 13, 2023** |
| JOHN DOE 5, OFFICER, | : | |
| | : | |
| Defendants. | : | |

## INITIAL REVIEW ORDER RE: SECOND AMENDED COMPLAINT

**HAIGHT, Senior District Judge:**

In this civil rights action pursuant to 42 U.S.C. § 1983, *pro se* plaintiff, Victor Lamond

Jordan, Sr., alleges unconstitutional conditions of his confinement at Northern Correctional Institution, where he was previously housed.[1]   Most recently, he filed a Second Amended Complaint in response to an order [Doc. 13] by Judge Covello, who presided over the case until the end of September 2022. In that "Ruling and Order," Judge Covello dismissed the Complaint for "failure to comply with Federal Rule of Civil Procedure 8," but granted leave to amend "within thirty days from the date of [the] order."  Doc. 13, at 27-28.

In the Second Amended Complaint, Plaintiff now sues the Department of Correction, and nineteen individual defendants, including:   former Commissioner Rollin Cook; Deputy Commissioner Angel Quiros;[2]   Giuliana Mudano, Warden of Northern (May to September 2019); Roger Bowles, Warden of Northern (October 2019); Solomon Baymon, Deputy Warden of Northern (May 2019); David Maiga, Director of Population Management; Gregorio Robles, Unit Manager of 1 West Unit at Northern; Captain Jackson, Administrative Captain of Intelligence and Investigations at Northern; Darren Chevalier, Unit Manager of 1 West Unit, Restrictive Housing at Northern (October 21, 2019); Captain Blackstock, Unit Manager of 1 West Unit, Restrictive Housing at Northern (July 22, 2020); Dr. Scott Mueller; Dr. Frayne,

---

[1] According to the Connecticut Department of Correction ("D.O.C.") website, Jordan is a "sentenced" inmate for the "controlling offense" of "sale of hallucinogenic/narcotic substance[s]."   http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=165080.   His "latest admission date" to prison was "4/17/2008," sentence date was "12/5/2008," "maximum sentence" received was "81 years," and maximum release date is "8/15/2088." *Id.*   He is currently housed at Garner Correctional Institution, a level 4 high-security facility in  Newtown Connecticut. The "care and treatment for adult male offenders with significant mental health issues . . . [have been] consolidated at this . . . facility." *See* https://portal.ct.gov/DOC/Facility/Garner-CI.

[2] The Court takes judicial notice that Governor Ned Lamont appointed Angel Quiros to serve as Commissioner of the Department of Correction in September of 2020.

Mental Health Supervisor (2019); Lieutenant Betances; Correctional Officer Leone; Lieutenant John Doe 1, Correctional Officer on third shift (May 31, 2019); John Does 2 and 3, Correctional Officers on third shift (May 31, 2019);  and John Does 4 and 5, Correctional Officers on first shift (June 3, 2019).  Doc. 14, at ¶¶ 114-36.  Defendants Cook, Mueller, Frayne, and John Does 2-5 are sued in their individual capacities for damages – compensatory, punitive, and nominal. *Id.* ¶¶ 118, 128-29, 133-36.  All other individual defendants are sued in both their individual and official capacities for damages and injunctive and/or declaratory relief.[3]  *Id.* ¶¶ 119-27, 130-32.

In a separate Ruling [Doc. 24], familiarity with which is assumed, the Court granted Plaintiff conditional leave to file the Second Amended Complaint [Doc. 14], which is the subject of this Ruling.[4]  With respect to his particular claims in the Second Amended Complaint, Plaintiff alleges violation of his Eighth Amendment rights under 42 U.S.C. § 1983, as well as violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101*, et seq.,* and the Rehabilitation Act ("RA"), 29 U.S.C. § 794(a).  In his discussion of the parties, as described above, Plaintiff states that he seeks damages and injunctive relief, but includes no "prayer for relief" to specify either the amounts or forms of relief he seeks to recover.

---

[3] In his prior Amended Complaint, Plaintiff omitted defendants Quiros and Mudano and added defendant David Maiga, Director of Population Management. Doc. 12. In this latest complaint, he includes defendants Quiros and Mudano but omits Mulligan and Monete as named defendants.  In addition, Plaintiff has corrected inaccurate paragraph numbering.  Doc. 14, at ¶¶ 50, 62.

[4] In that Ruling [Doc. 24], the Court directed the Clerk to docket the Second Amended Complaint [Doc. 14] as a separate docket entry.  Pending that filing, the Court refers herein to "Doc. 14" when discussing the now-operative "Second Amended Complaint."

# I. STANDARD OF REVIEW

Under 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint seeking redress from a governmental entity, officer, or employee and dismiss any portion that "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A(b)(1)-(2).  Although highly detailed allegations are not required, the Complaint must "contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  This plausibility standard is not a "probability requirement" but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully." *Id.*

In reviewing the Complaint, the Court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (citation and internal quotation marks omitted).  *See also Cruz v. Gomez*, 202 F.3d 593, 596 (2d Cir. 2000).  However, the Court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber*, 648 F.3d at 104 (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008)).  Moreover, "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by

4

mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).  Ultimately, "determining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Id.* at 663-64 (citing *Twombly*, 550 U.S. at 556).

Dismissal of the complaint is only appropriate if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cruz*, 202 F.3d at 597 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  "This rule applies with particular force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se*." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998).

With respect to *pro se* litigants, it is well-established that "[*p*]*ro se* submissions are reviewed with special solicitude, and 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Matheson v. Deutsche Bank Nat'l Tr. Co.*, 706 F. App'x 24, 26 (2d Cir. 2017) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (*per curiam*)).  *See also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

This liberal approach, however, does not exempt *pro se* litigants from the minimum pleading requirements described above: a *pro se* complaint still must "state a claim to relief that is plausible on its face." *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).  Therefore, even in a *pro se* case, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Chavis v. Chappius*, 618

F.3d 162, 170 (2d Cir. 2010) (citation and internal quotation marks omitted).  The Court may not

"invent factual allegations" that the plaintiff has not pled.  *Id*.

## II.  BACKGROUND

The facts recounted herein are alleged in the Second Amended Complaint [Doc. 14].  For

purposes of this review, these facts are accepted as true and all inferences are drawn in the light

most favorable to Plaintiff.  *Faber*, 648 F.3d at 104; *Cruz*, 202 F.3d at 596.

This action concerns Plaintiff's solitary confinement in Administrative Segregation at

Northern Correctional Institution ("Northern") in 2019 and 2020.  Plaintiff was transferred to

Northern in 2019, following an incident at MacDougall-Walker Correctional Institution

("MacDougall") on May 30, 2019, when Plaintiff refused to leave his cell.  That incident is the

subject of another lawsuit pending in this District, *Jordan v. Gifford*, No. 3:19-cv-1628 (CSH).

The day after the MacDougall incident, Plaintiff was transferred to Northern.

Upon his arrival at Northern, Lieutenant Doe and two Officers Doe escorted Plaintiff to

the medical unit.  Doc. 14 ("Second Amended Complaint"),  ¶¶ 25-26. A nurse checked him but

did not treat his visible injuries, namely a "gash" on his right wrist caused by officers applying

pressure to his handcuffs at MacDougall.  *Id.* ¶  26.  Lieutenant Doe told Plaintiff that he would

not receive treatment because he had assaulted correctional officers.  *Id.*  The nurse dismissed the

gash as "nothing" and instructed Plaintiff to "stop complaining."  *Id.*  Plaintiff was allowed "to

cleanse and attempt to decontaminate himself" in a medical cell but he did not receive hygiene

items to clean the chemical agent that had been sprayed on him in the MacDougall incident.  *Id.*

He alleges he suffered "psychological torment" and "physical pain" from the remnants of

chemical spray.  *Id*. ¶ 27.  According to Plaintiff, whenever he perspired, the chemical would

reactivate.  *Id.* ¶ 31.  Seeking relief from his suffering, he allegedly informed  Dr. Mueller and Nurse Kelham that the chemical agent was "in his beard and hair on his genitals,"  but "neither one did anything to help" him.  *Id.*

On May 31, 2019, Plaintiff saw Dr. Mueller to discuss his mental health issues. *Id.* ¶ 28. However, rather than providing Plaintiff with the relief he sought,  Mueller allegedly interrogated Plaintiff in a manner to get him to say things favorable to the Department of Correction regarding the incident at MacDougall.  *Id.*  Plaintiff felt uncomfortable, and so did not tell Mueller the factual particulars of the MacDougall incident, such as alleged "sexual assault." *Id.* ¶ 29.  Rather, he simply stated that "he wasn't the aggressor in the attack."  *Id.*  In his report of the meeting, Mueller described Plaintiff as "ragefully angry," a description Plaintiff denies and attributes to the doctor's alleged bias.  *Id.* ¶¶ 30, 38.

From May 31, 2019, until June 3, 2019, Plaintiff remained in Northern's medical unit. *Id.* ¶ 32.  Upon leaving that unit, he was escorted through Northern's corridors by defendant Does 4 and 5, who disregarded his bodily pains.  *Id.*  Plaintiff informed both officers that his wrists were "very sore and tender," he had a cut on his right wrist, and his "shackles were biting into the back of his ankles," but the officers made him continue walking.  *Id.*  When Plaintiff said he wanted to contact the state police, the officers told him to ask the unit manager.  *Id.*  Upon arriving at 1 West Unit, Plaintiff  was met by Unit Manager Gregorio Robles, who "made it clear that he would not be facilitating" Plaintiff's request for medical aid, stating, "It's not going to happen." *Id.* ¶ 33.

Robles then directed Plaintiff to cell 106, which allegedly included "mirrored windows" and a "maze[-]like structure."  *Id.* ¶ 34.  Once his restraints were removed, Plaintiff requested

7

hygiene items, clothing, and shoes, but was given nothing. *Id.* Because Plaintiff had been wearing the same jumpsuit for three days, he removed it. *Id.* This left him naked in his cell when female officers came to his cell to distribute mail. *Id.* Plaintiff complained to these officers that he had not been provided hygiene items, clothing, or a towel. *Id.* Eventually, he received underwear and a towel, but no hygiene items or cleaning supplies. *Id.* The cell was filthy as the toilet had backed up and fecal material was caked on the toilet. *Id.*

During his confinement in that cell, Plaintiff experienced a severe anxiety attack; he felt "as if the walls were closing in on him" and he was depressed about the conditions of the cell. *Id.* ¶ 35. He also feared retaliation by correctional staff. *Id.* He made requests to see medical and mental health staff but received no appointments until he submitted an inmate request on June 9, 2019. *Id.*

Later that week, Plaintiff saw Dr. Mueller and discussed the "poor conditions" of his cell and the negative effect they were having on his mental health. *Id.* ¶ 36. Mueller was allegedly not concerned about these effects on Plaintiff and "only started to take notes when Plaintiff . . . discuss[ed] when and why he gets angry." *Id.* ¶ 37.

On June 14, 2019, Plaintiff attended an Administrative Segregation hearing, which was "being conducted prior to Plaintiff being found guilty of any wrongdoing." *Id.* ¶ 39. Later in June, Plaintiff thus complained to Warden Mudano that the Administrative Segregation hearing had been held before he could be found guilty of allegedly assaulting a DOC employee. *Id.* ¶ 40. To Plaintiff, it seemed as if the outcome of the pending disciplinary hearing was predetermined. *Id.* He told Mudano that he refused to participate in the Administrative Segregation program if he was going to be classified for the program "illegally, without proper due process and an

investigation into [his] claims." *Id.* ¶ 41.

Furthermore, Plaintiff complained to Warden Mudano about his treatment by Lieutenant Doe 1 and Officer Does 2 and 3 upon his arrival at Northern, including forcing him to walk on injured feet and ankles and employing "bully tactics" to instill fear. *Id.* ¶ 42. He also complained about being placed in a "filthy cell with no hygiene materials and/or cleaning supplies" and no clothing or footwear other than a yellow jumpsuit. *Id.* ¶ 43. Plaintiff told Warden Mudano that he was not decontaminated from the chemical spray employed at MacDougall. *Id.* ¶ 44. Consequently, he suffered with severe burns over "most of his body[,] including his genitals and buttocks." *Id.*

On June 19, 2019, David Maiga, DOC Director of Population Management, authorized Plaintiff's placement on Administrative Segregation status. *Id.* ¶ 45. On June 25, 2019, Plaintiff appealed this placement, but Deputy Commissioner Angel Quiros denied that appeal. *Id.* ¶ 46.

Thereafter, while Warden Mudano toured his unit, Plaintiff again complained to her about his cell's conditions and his status in the Administrative Segregation program. *Id.* ¶ 47. He also asserted that it was unfair and depressing that he was housed in a unit where other inmates were permitted access to electronics while he was not. *Id.* ¶ 48. Plaintiff explained that these inmates made him miserable by "bragging" and "antagonizing him" with their boasts regarding the programs they were watching or hearing. *Id.* Warden Mudano, however, only responded by telling Plaintiff "to suffer in silence." *Id.*

On October 1, 2019, Plaintiff filed a grievance (via prison form CN 9601) regarding the conditions of his confinement – the "inhumane conditions and solitary confinement" – and sent copies to Warden Bowles, Deputy Warden Baymon, Captain Chevalier, Commissioner Cook,

9

and Deputy Commissioner Quiros. *Id.* ¶ 51.  Plaintiff alleges he received no responses. *Id.*  On October 23, 2019, Plaintiff filed a second grievance (prison form CN 9602) addressing the conditions of his confinement and their "harmful" effects on his mental health.  *Id.* ¶ 52.  On December 5, 2019, Bowles rejected the October 23 grievance as untimely filed under prison Administrative Directive 9.6.[5]  *Id.*  On December 9, 2019, Plaintiff appealed Bowles' rejection (via form CN 9604), but that appeal was rejected by Bowles on February 7, 2020.  *Id.*

On March 16, 2020, Plaintiff filed an inmate request (CN 9601) addressed to Captain Chevalier, Captain Robles, Warden Bowles, and Deputy Warden Baymon – with copies to Governor Lamont and Commissioner Cook.  *Id.* ¶¶ 57, 87.   In that request, Plaintiff informed these officials of "the inhumane conditions of his confinement," as well as the "violation of his human rights." *Id.* ¶ 57.  Plaintiff alleges he received no response to this request.  *Id.*  On April 7, 2020, Plaintiff appealed the lack of response to his inmate request (via form CN 9602).  *Id.* ¶ 88.  That appeal was rejected on May 19, 2020.  *Id.* ¶ 87.  In response, Plaintiff filed an appeal of the rejection (form CN 9604) on May 21, 2020.  *Id.*  On June 12, 2020, that second appeal was rejected by a "Level 2 Reviewer." *Id.*

Twice Plaintiff asked Captains Chevalier and Robles why, unlike the other inmates in his unit and on his tier,  he could not have his electronics property.  *Id.* ¶ 58.  Plaintiff asserted that

---

[5] Pursuant to DOC Administrative Directive 9.6, an inmate grievance form CN 9602 "must be filed within 30 calendar days of the occurrence or discovery of the cause of the Grievance."  DOC Admin. Dir. 9.6(6)(a)(ii)(4).

Also, on December 5, 2019, Plaintiff responded to the rejection of his October 23 grievance by filing a new request (CN 9601) to address the conditions of his confinement. Doc. 14, ¶ 55.  He alleges he received no response to this new request. *Id.* ¶ 56.

he was depressed because of his lack of "visual stimuli" and access to the news. *Id.* Unlike the inmates with "special circumstances" and "special needs," he was not permitted to have electronics – a tactic he believes that prison officials use to get "sadistic pleasure out of seeing inmates like [him] suffer." *Id.* ¶ 59.

As a result of his solitary confinement on Administrative Segregation status, Plaintiff alleges that he acquired the need to take additional medications and experienced episodes of chronic chest pains, problems breathing, inability to sleep for long periods of time, and worsening gastrointestinal pain. *Id.* Plaintiff also asserts that he suffered psychological "torture" due to deprivation of electricity. *Id.* ¶ 60. Specifically, he remained "practically in the dark" while other inmates had access to electricity to power their electronics. *Id.* When he complained to "both defendants," presumably Captains Chevalier and Robles, regarding the effect of the lack of electronics upon his mental health, they simply informed him that Administrative Segregation inmates are not permitted to have their electronics. *Id.* ¶ 61.

Due to his suffering from long-term confinement in solitary and damaging conditions, Plaintiff alleges he must take several medications. *Id.* ¶ 63. One of these medications, Clonidine, has major side effects on Plaintiff. *Id.* When Dr. Lee raised the dosage of that drug by milligrams, Plaintiff had to be taken to the hospital by ambulance. *Id.* He had been unable to eat without vomiting and suffered malnutrition for two weeks before being taken to the hospital *Id.* Plaintiff attributes his gastrointestinal issues to his solitary confinement. *Id.*

In addition, to address his mental health issues and pain, Plaintiff now takes Naraton,

Amitriptyline, and Zoloft – medications he did not take prior to solitary confinement.[6]  *Id.* ¶ 64. He also takes a vitamin D supplement to address a lack of natural sunlight.  *Id.* Vitamin D deficiency has allegedly caused his nails to become soft and brittle, leading to nail cracking and infection of his fingertips.  *Id.*

Plaintiff is particularly bitter that he has received different treatment from those who were not on Administrative Segregation.  While inmates on other classification statuses were permitted electronics in cells with power outlets, Plaintiff was only allowed to possess a transistor radio and was required to purchase batteries.  *Id.* ¶ 65.  Moreover, other inmates were allowed to purchase cosmetic items, but Plaintiff was not.  *Id.*  Plaintiff was forced to exercise in his cell – "enclosed in a cage like an animal" and lacking oxygen – whereas other inmates were able to go outside or exercise in  the gymnasium with work-out equipment. *Id.* At one point, Plaintiff also allegedly had an injury that required therapy but was not permitted to see an orthopedist.  *Id.*

Plaintiff expressed his frustrations to Dr. Mueller, explaining that he was depressed that others had privileges he did not possess.  *Id.* ¶ 66.  He also told the doctor of his belief that such disparate treatment was cruel. *Id.*

Although Plaintiff refused to participate in the Administrative Segregation program, he was advanced through the program.  *Id.* ¶ 68.  Thereafter, defendants Chevalier and Blackstock issued Plaintiff disciplinary reports ("D.R"s) and he was regressed in status.  *Id.* ¶ 67.  Plaintiff

---

[6] The Court has no knowledge of a drug called "Naraton" and advises Plaintiff to examine his medications to confirm proper spelling.

believes that the issuance of the D.R.s was due to his "refus[al] to participate" in the program because his "stance" was that his placement had been "illegal." *Id.*

According to Plaintiff, defendants Cook, Quiros, Mudano, and Bowles were "collectively" responsible at all relevant times for correctional policies and practices implemented at Northern. *Id.* ¶ 69. Plaintiff alleges that these defendants have failed to address the abuse of inmates who are housed in the "supermax" Northern prison. *Id.* For more than two decades, correctional officials have allegedly been aware of the harmful effects of solitary confinement on inmate mental health. *Id.* ¶¶ 70-71. Plaintiff thus deems solitary confinement "inhumane" and "a form of torture . . . that destroys the mind and body." *Id.* ¶ 70. In order to rectify the "mental, psychological damage" that he has suffered, Plaintiff clarifies that he is "not requesting" but is rather "demanding" that he receive mental health treatment from the DOC. *Id.* ¶ 73.

Plaintiff asserts that the DOC has failed to provide certified mental health professionals for inmates 24 hours, 7 days a week. *Id.* ¶ 76. Moreover, very few members of mental health staff have been available on weekends or second shift; and none have been available on third shift. *Id.* Instead, nurses have substituted for mental health staff; and these nurses often approve the use chemical agents or forcible extraction practices on mentally ill inmates, resulting in inmates' confinement on in-cell restraint status for lengthy periods. *Id.* ¶¶ 77-78. Defendants Robles, Chevalier, and Blackstock allegedly employed "fear tactics" – threatening mentally ill inmates that they would be sprayed with chemical agent – in an effort to gain compliance when inmates covered their cell door windows. *Id.* ¶ 79. Such inmates simply wanted to speak to a mental health professional instead of a nurse. *Id.*

13

Plaintiff also alleges that in retaliation for his many grievances, Captain Chevalier issued Plaintiff a disciplinary report after he had progressed to phase 2 of Administrative Segregation ("A/S") and was no longer handcuffed when outside of his cell.  *Id.* ¶ 89.  Despite Plaintiff's failure to participate in the A/S Program, Warden Bowles released him from A/S status, claiming he had completed the program.  *Id.* ¶ 91.  Immediately before Plaintiff's removal, however, he received two disciplinary reports for threatening staff and pled guilty.  *Id.*  Plaintiff was ultimately discharged from the A/S Program on October 14, 2020.  *Id.* ¶ 93.

A year earlier, on October 31, 2019, Captain Chevalier issued Plaintiff a disciplinary report ("D.R.") in response to Plaintiff's notice to the unit administrator that he was concerned about his safety and security. *Id.* ¶¶ 89, 94.  In that notice, Plaintiff "made it clear" that "he was not going to participate in the A/S program." *Id.* ¶¶ 89.  Plaintiff asserts that he had the right to give such notice under DOC Administrative Directive 9.9.[7]  *Id.* ¶ 94.  Following the D.R., Plaintiff was regressed in status, which placed him back on restraints and barred his commissary privileges.  *Id.*

Moreover, Plaintiff alleges that Officer Leone, the disciplinary investigator, failed to exercise due diligence in investigating the October 31, 2019, report, which allegedly falsely

---

[7] Plaintiff refers to no text in Administrative Directive 9.9, but the Court notes that paragraph 5 of that directive states, in relevant part:

> The Unit Administrator or designee shall ensure immediate and appropriate action to protect an inmate upon notification of a substantial risk of serious harm to the inmate.

DOC Admin. Dir. 9.9(5) (captioned, "Initial Action and Assessment").

accused Plaintiff of refusing housing. *Id.* ¶ 95. Officer Leone had also allegedly concealed the fact that Plaintiff did not receive a copy of a May 30, 2019, disciplinary report (regarding the MacDougall incident) in a timely fashion. *Id.* ¶¶ 96-97. Subsequently, Lieutenant Betances, the disciplinary hearing officer on both the May 30 and October 31, 2019, disciplinary charges, found Plaintiff guilty by allegedly ignoring evidence that should have been presented and failing to acknowledge that the charges should have been dismissed due to procedural errors. *Id.* ¶ 98.

At an unidentified time, while Plaintiff was being treated in a medical room of the 1 West Unit of Northern, he allegedly "yelled out" to Deputy Commissioner Quiros to ask him why Patricia Saltzman was being permitted to continue working in that area after several inmates had accused her of sexual misconduct. *Id.* ¶ 99. Although Quiros and External Affairs Director Karen Martucci both told Plaintiff that the problems with Saltzmann would be remedied, "[t]hey did nothing." *Id.* ¶ 100. Plaintiff admits that after Saltzmann was not removed, he began "acting out, being disruptive, covering [his] cell door window, and making threats" to correctional and mental health staff. *Id.* ¶ 101.

Two weeks elapsed after mental health employees, Dr. Mueller and Eddie Gonzalez, were given notice of Plaintiff's complaints regarding Saltzmann's misconduct prior to her removal and the onset of a PREA (Prison Rape Elimination Act) investigation. *Id.* ¶ 102. By that time Plaintiff's mental health condition began "spiral[ing] out of control." *Id.* ¶ 103. He began seeing people and creatures in his cell and hoarding medication in preparation to commit suicide. *Id.* At this same time, although Plaintiff was in Phase 2 of the A/S Program (*i.e.,* not required to be restrained while in the housing unit), Captain Blackstock allegedly put Plaintiff back on restraints for no reason. *Id.* ¶ 104. He also issued a memo directing that Plaintiff be

handcuffed behind his back while in the housing unit.  *Id.*  Plaintiff believes Blackstock took this action to retaliate for Plaintiff's PREA complaints and other grievances.  *Id.* ¶ 105.

On October 8, 2020, Lieutenant Monete placed Plaintiff in the shower during a shakedown of his cell.  *Id.* ¶ 106.  Plaintiff told Monete that he could not be placed in a small, closed space for long due to his anxiety; therefore, if the search would be long, Plaintiff needed to be placed somewhere else.  *Id.* ¶ 107.  Although Lieutenant Monete said the search would be quick – "only a few minutes, five minutes" – it actually took more like ten minutes.  *Id.* ¶ 108. Plaintiff suffered an anxiety attack and requested medical and mental health treatment, showing that his hands had become bloody.  *Id.* ¶¶ 108, 110.  Plaintiff told Lieutenant Monete and Lieutenant Joe that he wanted photos taken of his hands, but photos were never taken.  *Id.* ¶ 110. Thereafter, mental health worker Gonzalez came to see Plaintiff, but Plaintiff claimed he was "biased" and attempted to "cover up" his colleagues' misconduct. *Id.* ¶ 111. Plaintiff thus refused to have a session with Gonzalez.  *Id.*

### III.  ANALYSIS

The Court previously dismissed Plaintiff's claims for denial of equal protection of the laws regarding inmate property, denial of procedural due process, and a general challenge to confinement on Administrative Segregation status.  *See* Doc. 13, at 16-19.  Plaintiff was permitted to amend his complaint to assert claims arising under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*,  and the Rehabilitation Act (RA), 29 U.S.C. § 701, against the Department of Correction ("DOC"), "relating to confinement in prolonged isolation, his Eighth Amendment claim for prolonged isolation, and possibly his claim against defendant Monete."  Doc. 13, at 27-28.  Although Plaintiff includes allegations relating to his previously

16

dismissed claims in his Second Amended Complaint, he merely restates the allegations without addressing the reasons why the claims were dismissed.  As he alleges no facts to correct the deficiencies identified in Judge Covello's prior Order  [Doc. 13], those claims are not revived. *See, e.g.,  Schlosser v. Walker*, No. 3:20cv433 (WIG), 2020 WL 7324679, at *2-3, 6 (D. Conn. Dec.11, 2020) (ADA claim not revived where plaintiff failed to correct deficiencies identified in prior order).

In addition, the Court informed Plaintiff that if he intended to pursue a claim against Lieutenant Monete regarding the October 8, 2020, shower incident, he must assert that claim in his amended complaint. Doc. 13, at 27. Once again Plaintiff has failed to assert a separate claim against Lieutenant Monete.  Although he discusses Monete in various paragraphs, Plaintiff fails to include him as a defendant in his list of "Parties," Section D. of his Second Amended Complaint, in which he enumerated and described in detail the identities of all defendants. Doc. 14, ¶¶ 114-36.  Jordan also fails to assert any separate, identified claim against Monete.  Under these circumstances, the Court deems any claim against Monete to be abandoned.

In his Second Amended Complaint, Plaintiff includes four causes of action: (1) an Eighth Amendment "deliberate indifference" claim against defendants Cook, Quiros, Maiga, Baymon, Mudano, Bowles, Chevalier, Robles, Blackstock, Frayne, Mueller, Betances, and Leone for prolonged placement in solitary confinement and against defendants Chevalier, Betances, Leone, and Blackstock for creating scenarios to prolong his placement there; (2) an Eighth Amendment claim against all defendants for prolonged placement in isolation when they were aware that he suffers from mental illness; (3) an Eighth Amendment claim against John Does 1-5 and Robles for requiring Plaintiff to walk on injured legs and failing to facilitate his access to the state

17

police; and (4) ADA and RA claims against the Department of Correction regarding prolonged confinement in isolation.

## A.  Individual Defendants in Their Official Capacities

At the outset, the Court notes that Plaintiff has sued all individual defendants – except Cook, Mueller, Frayne, and John Does 2-5 – in both their official and individual capacities. Doc.14, ¶¶ 119-27, 130-32. The excepted defendants are sued solely in their individual capacities. *Id.* ¶¶ 118, 128-29, 133-36.

As to individual defendants acting in their official capacities, "the eleventh amendment immunity protects state officials sued for damages." *Minotti v. Lensink*, 798 F.2d 607, 609 (2d Cir. 1986) (citing *Kentucky v. Graham*, 473 U.S. 159, 169-70 (1985)). *See also Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Quern v. Jordan*, 440 U.S. 332, 342 (1979) (claims for damages against defendants in their official capacities are barred by Eleventh Amendment); *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 193 (2d Cir. 2015) ("The Eleventh Amendment bars a damages action in federal court against a state and its officials when acting in their official capacity unless the state has waived its sovereign immunity or Congress has abrogated it.").  To the extent that Plaintiff seeks damages from state officials in their official capacities, his § 1983 claims are barred by the Eleventh Amendment and will be dismissed.

## B.  Claims Against Defendants in Their Individual Capacities

### 1.  Eighth Amendment Prolonged Isolation

In his first cause of action, Plaintiff contends that individual defendants Cook, Quiros,

Maiga, Baymon, Mulligan, Mudano, Bowles, Chevalier, Robles, Blackstock, Frayne, Mueller, Betances, and Leone violated his Eighth Amendment rights by subjecting him to prolonged confinement in isolation.[8]  In his second cause of action, he argues that all defendants violated his Eighth Amendment rights by subjecting him to prolonged placement in isolation while aware of his mental illness.

In his prior Ruling, Judge Covello considered Plaintiff's first cause of action a "general challenge to prolonged isolation" and found that Jordan had failed to "allege that any defendant was personally involved in this claim." Doc. 13, at 15.  Accordingly, the Court dismissed Plaintiff's challenge to prolonged isolation without prejudice. *Id.*  In this Second Amended Complaint, Plaintiff includes additional defendants but makes general, conclusory allegations. He states that all such defendants "knew or should have known that the conditions of confinement at Northern C.I. . . .  deprived Plaintiff of the minimum civilized measure of life's necessities." Doc.14,  ¶ 140.  He also alleges that these defendants used unspecified "nefarious means to regress and prolong his placement and continuous torture within the conditions of confinement." *Id.* ¶ 141.  He then names defendants Chevalier, Betances, Leone, and Blackstock as creators of general "scenarios to set up and entrap" him so that they could "continue to subject him to the cruel and unusual conditions of confinement." *Id.* ¶ 142.

In his second cause of action, Plaintiff again generally claims that all defendants violated

_____

[8] Although included in a list by Plaintiff in ¶ 140 of the first "Cause of Action," Mulligan is not named as a defendant in the Second Amended Complaint and is not mentioned in the factual allegations.  The Court finds any claim against Mulligan has been abandoned in the Second Amended Complaint.

his Eighth Amendment rights because he had a mental illness but was "designat[ed] and maintain[ed]" in "prolonged confinement." *Id.* ¶¶ 145-46.   Without discussing individual defendants or specific facts, he simply alleges that all defendants possessed "malicious, wanton, sadistic motives" to inflict "severe psychological and/or physical damage." *Id.* ¶ 147.

Plaintiff's second claim is dismissed herein as a separate claim because, as discussed in the prior Order, he  has not alleged facts showing how each defendant was aware of his mental illness. Doc. 13, at 15.   Moreover, because both his first and second claims allege exacerbation of his mental illness due to prolonged isolation, they essentially comprise one claim.  The Court thus considers the allegations supporting the two claims together under one claim for prolonged isolation.

To state a cognizable Eighth Amendment claim for unconstitutional conditions of confinement, Plaintiff must allege facts establishing an objective element – *i.e.,* "the deprivation was sufficiently serious that he was denied the minimal civilized levels of life's necessities" – and a subjective element – *i.e.,* defendants "acted with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety." *Washington v. Artus*, 708 F. App'x 705, 708 (2d Cir. 2017) (summary order) (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks omitted)). *Accord Gonzalez v. Hasty*, 802 F.3d 212, 224 (2d Cir. 2015) ("In order to establish an Eighth Amendment violation, an inmate must show '(1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) a sufficiently culpable state of mind on the part of the defendant official....'") (quoting *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)).   Specifically, Plaintiff must allege facts showing that the defendants knew "of and disregard[ed] an excessive risk to inmate

health or safety," so that they were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed] and ... dr[ew] that inference." *Phelps v. Kapnolas*, 308 F.3d 180, 185-86 (2d Cir. 2002).

Objectively, the seriousness of a violation is determined based on contemporary standards of decency. *See Walker*, 717 F.3d at 125. The inquiry focuses on the "severity and duration" of the conditions, not any "resulting injury." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (citing *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015)). In this claim, Plaintiff challenges his confinement in prolonged isolation and the resulting effect on his mental health. Plaintiff references studies on the ill-effects of confinement in prolonged isolation and a previous lawsuit in this district challenging the confinement of mentally ill inmates in isolation. Doc. 14, ¶ 140. Thus, for purposes of initial review, the Court assumes that Plaintiff's allegations regarding his mental health satisfy the objective element.

Defendants Cook, Quiros, Maiga, Baymon, Mudano, Bowles, and Frayne are supervisory officials. In *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), the Second Circuit clarified the standard to be applied to a claim of supervisory liability. Specifically, the Second Circuit adopted the Supreme Court's reasoning in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), holding that "after *Iqbal*, there is no special rule for supervisory liability." *Tangreti*, 983 F.3d at 618. "Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Id.* (quoting *Iqbal*, 556 U.S. at 676).

Knowledge that unconstitutional acts were occurring is insufficient to state a claim for supervisory liability. "A supervisor's 'mere knowledge …' is not sufficient because that

knowledge does not amount[] to the supervisor's violating the Constitution." *Tangreti,* 983 F.3d at 616-17 (quoting *Iqbal*, 556 U.S. at 677). *See, e.g., Lopez v. Chappius*, No. 6:17-CV-06305 (EAW), 2021 WL 859384, at *2 (W.D.N.Y. Mar. 8, 2021) (holding receipt of communication insufficient to show personal involvement: "Even before *Tangreti*, it was 'well-established that a supervisor's failure to respond to a letter of complaint does not provide a sufficient basis to find the defendant was personally involved in the deprivation alleged.'") (citations omitted).

### *a.  Defendants Bowles, Quiros, and Mudano*

Plaintiff alleges that defendants Bowles and Quiros were recipients of, and decisionmakers with respect to, his grievances regarding solitary confinement.  He thus alleges they both had personal knowledge of his conditions of confinement and rejected his requests for relief.

For example, Plaintiff alleges that on June 25, 2019, he appealed his placement on Administrative Segregation status to Deputy Commissioner Quiros,  "who denied the appeal . . . without any real unbiased review of the issues Plaintiff [had] raised," including allegations of "excessive force and sexual assault by DOC officers on May 30, 2019."   Doc. 14, ¶ 46. According to Plaintiff, Quiros was thus aware of his inhumane conditions of confinement and refused to remedy them.

In addition, Plaintiff alleges that on October 1, 2019, he filed an inmate request describing the "inhumane conditions and "horrible treatment" during his confinement at Northern, sending copies to Warden Bowles and  Deputy Commissioner Quiros.  *Id.* ¶ 51.  On October 23, 2019, Plaintiff allegedly filed a grievance addressing the "inhumane conditions" of his solitary confinement and their detrimental effect on his mental health.  *Id.* ¶ 52.     On

December 5, 2019, Bowles rejected the October 23, 2019,  grievance as untimely filed.[9] *Id.* ¶ 54.
On December 9, 2019, Plaintiff appealed that rejection, but the appeal was resolved as "rejected"
by  Bowles on February 7, 2020.  *Id.*

With respect to Warden Mudano, Plaintiff alleges he had multiple conversations with her
regarding the inhumane conditions of his confinement, but she failed to remedy those conditions.
Plaintiff  alleges  that  in  June  2019,  he  informed  Mudano  that   upon  his  arrival  at  Northern,
Lieutenant  Doe  1  and  Officer  Does  2  and  3  employed  "intimidating,  bully  tactics"  to  force
Plaintiff to walk through the corridors on  injured feet.  *Id.* ¶ 42.  At that time, Plaintiff allegedly
complained to Warden Mudano about his "placement in [a] filthy cell with no hygiene materials
and/or cleaning supplies" and the denial of clothing or footwear other than a yellow jumpsuit.
*Id.* ¶ 43.   Plaintiff also told Warden Mudano that he had not been properly  decontaminated from
chemical spray so suffered severe burning over most of his body.  *Id.* ¶ 44.

In addition, following Director Maiga's authorization on June 19, 2019, to place Plaintiff
on Administrative Segregation status,  *id.* ¶ 45,  Warden Mudano toured Plaintiff's unit, *id.* ¶ 47.
At that time, Plaintiff complained to her about his "inhumane conditions of his confinement" and
she "informed him that he would suffer in silence."  *Id.*   Plaintiff also explained to Mudano
"how unfair and depressing it was to be in the same unit with other inmates [who had access to]
their property," especially "electronics," while Plaintiff was allowed no such access. *Id.*  ¶ 49.
Plaintiff informed Mudano that hearing other inmates brag about what they were watching or

---

[9] Plaintiff asserts that his grievance was timely in that it addressed a continuing violation
of  his  Eighth  Amendment  rights,  the  inhumane  conditions  of  his  confinement  at  Northern.
Doc. 14, ¶ 54.

listening to made him "miserable," but she simply told him to "suffer in silence." *Id.*

"[W]hen a supervisory prison official receives a particular grievance, personally reviews it, and responds and/or takes action in response, such conduct may constitute sufficient 'personal involvement' to establish individual liability for the alleged constitutional violation." *Young v. Choinski*, 15 F. Supp. 3d 172, 191 (D. Conn. 2014) (collecting cases). A supervisory official may thus be liable if he or she acts or responds in an inadequate fashion to remedy a constitutional violation after receipt of a prisoner's grievance or request. *See, e.g., Bourgoin v. Weir,* Civil No. 3:10cv391 (JBA), 2011 WL 4435695, at *5–6 (D. Conn. Sept. 23, 2011).

In the case at bar, Bowles, Quiros, and Mudano each received requests or appeals from Plaintiff regarding inhumane conditions of his confinement, and each personally responded by refusing or deflecting them. Treating the *pro se* Plaintiff with solicitude, drawing all reasonable inferences in his favor, and assuming the alleged facts to be true, the Court finds that, at the pleading stage, Plaintiff has alleged sufficient facts to allow the Eighth Amendment prolonged isolation claim to proceed against Bowles, Quiros, and Mudano. The alleged facts state a plausible claim that defendants Bowles, Quiros, and Mudano were personally aware of, and yet disregarded, a serious risk of harm to Plaintiff. The Eighth Amendment claim will proceed against these three defendants.

### b. *Defendant Cook*

With respect to prolonged isolation, Plaintiff sues defendant Commissioner Cook in his individual capacity for permitting the continuation of a policy that confined mentally ill inmates in isolation while also denying them access to mental health professionals. After *Tangreti*, courts have recognized that "imposing liability for a defendant's role in creating or perpetuating

24

an unconstitutional policy is not necessarily inconsistent with *Tangreti* (or, for that matter, *Iqbal*) so long as the defendant's actions—not those of [his/]her subordinates—afford a basis." *Harnage v. Dzurenda*, No. 3:14-CV-885 (SRU), 2022 WL 972438, at *8 (D. Conn. Mar. 31, 2022) (quoting *Stone #1 v. Annucci*, No. 20-CV-1326 (RA), 2021 WL 4463033, at *7 (S.D.N.Y. Sept. 28, 2021)). *See also Meli v. City of Burlington, Vermont*, 585 F. Supp. 3d 615, 638 (D. Vt. 2022) ("[W]hile a supervisor cannot be found liable alone by reason of his supervision of others who committed the violation, it seemingly remains possible for a policy maker to be held liable for their creation or continuance of an unconstitutional policy or custom.") (citations, internal quotation marks, ellipsis, and brackets omitted).

Nonetheless, to state a claim that a supervisor has created or perpetuated an unconstitutional policy, a plaintiff must do more than make "conclusory statements that [the supervisor] participated in the creation of a policy under which he was denied [constitutional rights], and that [he/]she knew or should have known that [plaintiff] would suffer harm as a result." *Harnage*, 2022 WL 972438, at *9. "To be held liable as a policymaker, a plaintiff must demonstrate that the defendant had "the requisite *mens rea*, specifically that 'the supervisor had subjective knowledge of a substantial risk of serious harm to a [person] and disregarded it.' " *Meli*, 585 F. Supp. 3d at 638 (quoting *Tangreti*, 983 F.3d at 616). "Reading *Tangreti* and ... other decisions together ... a senior prison official can still be held liable for his role in creating a policy ... but ... only if the pleadings or record evidence 'permit the inference that [he] had subjective knowledge of the risk of the . . . abuse inflicted on [plaintiffs] and that [he] decided to disregard that risk.' " *Stone#1*, 2021 WL 4463033, at *9 (citing *Tangreti*, 983 F.3d at 619).

In the instant case, the Court examines the Complaint at the earliest stage of the

proceedings.   "At the pleading stage, courts recognize the common-sense principle that a plaintiff will often not be equipped to come forward with direct evidence of a defendant's subjective or actual knowledge or his intent." *Id*. at *10.  "As the Second Circuit noted . . . , 'A complaint is allowed to contain general allegations as to a defendant's knowledge, because a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.'" *Id.* (quoting *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021)).  Whereas merely being on notice of a risk of constitutional violation would be insufficient on summary judgment, courts tend to be more lenient at the pleading stage to allow plaintiffs the opportunity to gather evidence to establish a defendant's *mens rea. Id.*

In the case at bar, Plaintiff alleges that Cook was "collectively" responsible with defendants Quiros, Mudano, and Bowles for implementing and overseeing DOC's policies, protocols, procedures, and practices.  Doc. 14, ¶ 69,  Moreover, these officials failed to take "any effective action to correct and/or remedy the longstanding and well-known abuse of prisoners." *Id.*  As to Cook, he was DOC Commissioner at all relevant times so Plaintiff plausibly alleges that he bore responsibility for implementing and overseeing DOC policies, including solitary confinement.  Plaintiff also alleges that the DOC had previously been sued regarding its treatment of inmates with mental illness at Northern and Garner and there have been "longstanding studies and research" that have proven that "solitary confinement is inhumane and a form of torture . . . that destroys the mind and body." *Id.* ¶¶ 70-75.  At the pleading stage, these allegations plausibly suggest that Cook knew of and disregarded a serious risk of harm that solitary confinement posed to Plaintiff and other inmates with mental illness.  *See, e.g., Stone#1*, 2021 WL 4463033, at *11 ("[T]he Court concludes that Plaintiffs have succeeded in stating a

claim that [the acting and associate DOC commissioners] were personally involved in the constitutional deprivations they suffered by enacting or failing to enact policies and practices that resulted in a violation of their rights.")

Construing the Complaint liberally, as drafted by a *pro se* litigant, the Court finds that this prolonged isolation claim may proceed at the pleading stage for development of the record as to whether Cook possessed the requisite *mens rea* – knew of a significant risk to Plaintiff and disregarded it. Plaintiff is thus advised that as the case progresses, he will face a greater evidentiary burden on this claim. At present, however, the Eighth Amendment prolonged isolation claim will proceed against former DOC Commissioner Cook.

### c. *Defendant Frayne*

In the Second Amended Complaint, Plaintiff's only reference to Dr. Frayne is his identification of this defendant as a mental health supervisor in Plaintiff's description of "Parties." Doc. 14, ¶ 129. As such a supervisor, Plaintiff impugns him with knowledge of Northern's conditions of confinement and the responsibility to oversee all mental health personnel in that facility. *Id.* However, Plaintiff fails to allege that Dr. Frayne was aware of his particular mental illness and/or failed or refused to assign mental health staff on any specific occasion. Plaintiff simply alleges that Frayne held a supervisory position. Absent any allegations to demonstrate that Dr. Frayne knew of a significant risk to Plaintiff and disregarded it, Plaintiff has failed to state a plausible Eighth Amendment claim against Dr. Frayne. That claim will be dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### d. *Defendant Maiga*

With respect to defendant Maiga, Plaintiff describes him as the "Director of Population

27

Management" and states that he "manag[es] the Prison Population." Doc. 14, ¶ 123. In this position, Maiga is generally "aware of all facilitys [sic] in the state and the conditions of their confines [sic]." *Id.* The only specific allegation Plaintiff asserts against Maiga is that he approved Plaintiff's placement in Administrative Segregation on June 19, 2019. *Id.* ¶ 45. Plaintiff provides neither the facts nor the hearing procedures relied upon by Maiga to make this designation; nor does Plaintiff allege that Maiga was aware of Plaintiff's mental illness, the details of his confinement, and/or the potential effects of prolonged isolation on him.[10] Furthermore, Plaintiff alleges no facts to suggest that Maiga anticipated that Plaintiff would refuse to participate in the Administrative Segregation program so that he would remain in the program for an extended period.

Absent proof that Maiga was personally aware of Plaintiff's mental illness and disregarded the potential effects of his confinement, Plaintiff fails to plausibly allege that Maiga's placement of him in Administrative Segregation constituted an Eighth Amendment violation. This claim against defendant Maiga will be dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### e. *Defendant Baymon*

As to defendant Baymon, Deputy Warden of Northern in May 2019, Plaintiff simply alleges that he sent Baymon two inmate requests but received no response. Doc. 14, ¶¶ 51, 57,

---

[10] In fact, Plaintiff alleges that Maiga may have been misled at the hearing because Plaintiff's "Counselor Supervisor, E. Tugie, . . . introduced false and fabricated information, which was unfounded and biased." Doc. 14, ¶ 39. Plaintiff himself then decided "that he was not going to participate in or with the A/S Program" because he believed it would only "railroad him and classify him . . illegally." *Id.* ¶ 41. Plaintiff, therefore, failed to provide any helpful input for Maiga to determine his proper placement.

87.   "[A] supervisory official's mere receipt of a letter complaining about unconstitutional conduct is not enough to give rise to personal involvement on the part of the official." *Young v. Choinski,* 15 F. Supp. 3d 172, 189 (D. Conn. 2014) (collecting cases). *See also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir.1997) (prison official who received inmate's letter but forwarded it to subordinate for investigation and response was not personally involved in depriving inmate of constitutional right); *Rivera v. Doe*, No. 3:22-CV-852 (SVN), 2023 WL 319600, at *2 (D. Conn. Jan. 19, 2023) ("[M]ere notification of a legal transgression does not suffice to establish a defendant's personal involvement for purposes of a section 1983 claim.") (citing *Young,* 15 F. Supp. 3d at 189); *Jones v. Fischer*, No. 9:11–cv–774 (GLS/CFH), 2013 WL 4039377, at *10 (N.D.N.Y. Aug. 7, 2013) ("[R]eceipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement.") (citations omitted); *Smart v. Goord*, 441 F.Supp.2d 631, 642–643 (S.D.N.Y.2006) ("Commissioner Goord cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [Plaintiff] on July 12 and July 20."); *Greenwaldt v. Coughlin*, No. 93 Civ. 6551(LAP), 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.").

Standing alone, the allegation that Plaintiff sent Baymon a request regarding the conditions of his confinement is insufficient to demonstrate Baymon's personal involvement in an Eighth Amendment violation.  The Eighth Amendment claim against defendant Baymon will be dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

29

### f.  Defendants Chevalier, Robles, and Blackstock

Plaintiff alleges that defendants Chevalier, Robles, and Blackstock were unit managers of 1 West Unit at various times during Plaintiff's incarceration at Northern and were thus aware of the effects of prolonged isolation on him.  Plaintiff contends that they were personally aware of the conditions of his confinement because they managed inmates' "Administrative Segregation" status; acted as chairs of the "Unit Classification Committee,"  which oversaw inmates' special needs, special circumstances, and security risk groups; and had the responsibility and authority to progress or regress Plaintiff in the Administrative Segregation program. Doc. 14, ¶¶ 124, 126-27.

Instead of relieving Plaintiff's conditions in solitary confinement,  such as providing him access to mental health professionals, these unit managers issued him disciplinary reports which resulted in Plaintiff being regressed in the Administrative Segregation program and subjected him to harsher conditions. *Id.* ¶¶ 67-68, 89, 94, 104-05.  Because these defendants allegedly knew of and disregarded a significant risk to Plaintiff, suffering from mental illness in solitary confinement, Plaintiff's allegations at the pleading stage are sufficient to state plausible Eighth Amendment claims against Chevalier, Robles, and Blackstock.  Plaintiff will be left to his evidence as to these claims.

### g.  Defendant Mueller

Dr. Mueller is a mental health professional with whom Plaintiff met frequently.  During in-person discussions, Plaintiff repeatedly informed Mueller of the effects of solitary confinement on his mental health. For example, in June of 2019, Plaintiff "informed Mueller of the poor conditions of the cell [in which he was housed at Northern] and not being able to clean [that] cell." Doc. 14, ¶ 36.  Plaintiff allegedly explained that these "conditions were effecting

[sic] his mental health." *Id.*  However, Dr. Mueller "showed little concern" about the "negative effect" of the conditions upon him and took no notes on the subject.[11] *Id.* ¶ 37.

Under the Eighth Amendment, prisoners are not entitled to select the form of medical treatment they receive. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).  *See also  Sherman v. Corcella*, No. 3:19-CV-1889 (CSH), 2020 WL 4035064, at *6 (D. Conn. July 16, 2020).

However, in the case at bar, Plaintiff alleges that he received no care with respect to his mental issues arising from the conditions of his confinement.  Rather, he alleges that Mueller "showed little concern" about the negative effects of such confinement and "did not take notes regarding that subject."  Doc. 14, ¶ 37  Although Plaintiff may not dictate the form of medical treatment he receives, he is entitled to *adequate* treatment.  Failing to address the conditions giving rise to Plaintiff's declining mental state is an alleged failure to provide necessary care. These allegations are sufficient to demonstrate that Dr. Mueller knew of and disregarded a significant risk of harm to Plaintiff; they thus plausibly state an Eighth Amendment claim against Dr. Mueller.

### h.  Defendants Betances and Leone

Plaintiff's only references to defendants Betances and Leone in his Second Amended

---

[11] According to Plaintiff, Mueller repeatedly steered their conversations away from the cell conditions by asking Plaintiff to discuss his tendency to become "ragefully angry." Doc. 14, ¶ 38.

Complaint are general and conclusory. As to Betances, Plaintiff alleges that he had the "authority, responsibility, and duty to hear disciplinary reports." *Id.* ¶ 130. However, Plaintiff fails to address Betances' determinations regarding particular disciplinary reports and how any such decisions reflected deliberate indifference to Plaintiff's conditions of confinement.[12] He thus fails to demonstrate Betances' subjective involvement in Plaintiff's alleged inhumane conditions of confinement. After *Tangreti*, "a plaintiff must plead and prove that each Government-official defendant, through the official's *own individual actions*, has violated the Constitution." *Tangreti*, 983 F.3d at 618 (emphasis added). *See also Giraud v. Feder*, No. 3:20-CV-1124 (SRU), 2021 WL 1535751, at *6 (D. Conn. Apr. 19, 2021). Plaintiff has thus failed to show Betances acted with deliberate indifference to Plaintiff's health or safety.

With respect to Leone, Plaintiff alleges that he was the "D.R. Investigator . . . at all times relevant to this Complaint . . . , with all policies, protocols, practices[,] . . . procedures and conduct described herein." Doc. 14, ¶ 132. Broad allegations that a state official has authority to perform in a particular position are insufficient to allege an Eighth Amendment violation. *See, e.g., Styles v. Goord*, 431 F. App'x 31, 33 (2d Cir. 2011) ("The mere fact that a defendant possesses supervisory authority is insufficient to demonstrate liability for failure to supervise under 1983.") (citation omitted). "Personal involvement of the defendants in an alleged constitutional [violation] is a prerequisite to an award of damages under § 1983." *Id.*

---

[12] Although Plaintiff mentions the dates of two disciplinary reports (May 30, 2019 and October 31, 2019), he fails to specify any subjective action taken by Betances that demonstrates an intent to subject Plaintiff to inhumane conditions of confinement. Plaintiff simply argues in conclusory fashion that Betances must have been "biased" because the "D.R.s should have been dismissed." Doc. 14, ¶ 98.

Furthermore, Plaintiff merely alleges that Leone generally "failed to produce exculpatory evidence" to aid in dismissal of two disciplinary reports.[13]  *Id.* ¶ 98.  Plaintiff speculates that such evidence existed at MacDougall  but  provides no proof that Leone disregarded specific evidence and acted to intentionally subject Plaintiff to alleged dangers of prolonged isolation.

As Plaintiff alleges no specific facts against Betances and Leone to allege deliberate indifference to Plaintiff's alleged prolonged confinement in isolation, the Eighth Amendment claim will be dismissed as to each of these defendants under 28 U.S.C. § 1915A(b)(1).

## 2. Other Eighth Amendment Claims

In his third cause of action, Plaintiff argues that defendant Does 1-5 and Robles required him to walk on injured legs, made implied threats if he did not comply, and hindered his access

---

[13]  Plaintiff also speculates that Leone must have "covered up" a "process failure" that Plaintiff did not receive a copy of his May 30, 2019, disciplinary report (re: Plaintiff's alleged attack on a MacDougall DOC employee) within the allotted time set forth in Administrative Directive 9.5.  Doc. 14, ¶¶ 96-97.  Plaintiff specifies no provision in 9.5 but alleges that the report should have been delivered to him within 24 hours of the May 30 incident. Doc. 14, ¶ 96. However,  Administrative Directive 9.5 states that the report must be provided to the inmate within "24 hours prior to any disciplinary hearing" and "shall be produced within 24 hours of the hearing, excluding weekends and holidays." Admin. Dir. 9.5(c)(i), (l)(i). Here, Plaintiff alleges that on June 14, 2019, he attended an Administrative Segregation hearing, which was "being conducted *prior to* Plaintiff being found guilty of any wrongdoing." Doc. 14, ¶ 39 (emphasis added). It is thus unclear what hearing date Plaintiff addresses in these allegations.  Furthermore, he admits that Leone "brought the D.R. 3 days later while Plaintiff was in [a] medical cell " – *i.e.,* likely June 1 or 2, 2019. *Id.* ¶ 96.  Plaintiff arrived at Northern on May 31, 2019, and June 1 and 2, 2019, were weekend (not business) days so delivery of a disciplinary report by June 3 appears timely if the hearing occurred on June 4 or thereafter.

Additionally, in general, state prison directives do not in and of themselves confer constitutionally protected rights on inmates. *See Sandin v. Conner*, 515 U.S. 472, 481–82 (1995) (prison directives, which are designed primarily to guide correctional staff, do not confer rights on inmates). "[D]ue process protections are not implicated by the defendants' alleged failure to comply with administrative directives." *Riddick v. Chevalier*, No. 3:11CV1555 (SRU), 2013 WL 4823153, at *4 (D. Conn. Sept. 9, 2013).

to the state police.

### a. *Defendants Does 1-3*

Plaintiff alleges that upon his arrival at Northern, Officer Does 1-3 forced him to walk on injured feet and ankles and employed "bully tactics" to get him to comply.  Doc. 14, ¶¶ 32, 42. Plaintiff also alleges that these officers denied him cleaning and hygiene supplies to clean his cell and decontaminate himself from the effects of the chemical agent used at MacDougall because he had "assaulted C/Os [corrections officers]." *Id*. ¶¶ 43-44.

However, in contrast to these allegations, Plaintiff also admits that he received medical attention later that same day, May 31, 2019, and remained in the medical unit for three days. *Id.* ¶¶ 25-26, 32. He also admits that the reason he was escorted by Does 1-3 was to go to the medical unit. *Id*. ¶ 26.

As to the conditions of his escort to and from the medical unit on May 31, 2019, Plaintiff makes no "excessive force" claim.  However, even if he had, Plaintiff fails to plead the requisite facts to make out such a claim. To establish a claim of excessive force under the Eighth Amendment, the prisoner must satisfy a subjective and an objective component. *See Sims v. Artuz*, 230 F.3d 14, 20-21 (2d Cir. 2000).  The subjective component of the claim requires a showing that the official's use of physical force was "malicious[ ] and sadistic[ ] rather than as part of a good-faith effort to maintain or restore discipline." *Wilkins v. Gaddy*, 559 U.S. 34, 40 (2010)  (quoting *Hudson v. McMillian*, 503 US. 1, 7 (1992)). The objective component "focuses on the harm done" in light of contemporary standards of decency, "but the amount of harm that must be shown depends on the nature of the claim." *Sims*, 230 F.3d at 21.

In the case at bar, Plaintiff has failed to show that  he suffered circumstances defying the

standards of decency. He provides no medical proof that his walk through  the Northern corridors

caused him notable injury or extreme pain.   Restrictions, such as shackles during transit, do not

violate the Eighth Amendment unless their use is "totally without penological justification,"

"grossly disproportionate to the severity of the crime," or "involve[s] the unnecessary and

wanton infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 346  (1980) (internal citations

omitted). *See, e.g.,  Alston v. Butkiewicus*, No. 3:09-CV-207 CSH, 2012 WL 6093887, at *9 (D.

Conn. Dec. 7, 2012) ("Requiring a particular inmate to shower while wearing shackles for

security reasons does not constitute an Eighth Amendment claim.") (collecting cases).

Moreover, Plaintiff fails to plead facts to show that the intention of Does 1-3  in walking

him to medical was malicious or sadistic rather than pragmatic – *i.e.*, the general use of  shackles

in transit "in a good-faith effort to maintain or restore discipline," *Sims*, 230 F.3d at  21. Plaintiff

himself has asserted that he needed assistance from the medical unit and presented no facts to

suggest he was physically incapable of walking there.   Under these circumstances, Plaintiff has

stated no plausible Eighth Amendment claim with respect to excessive force.

However, as to personal decontamination, Plaintiff alleges that Officer Does 1-3 denied

him hygiene items to enable him to remove residual chemical agent from his skin.  Doc. 14,

¶¶ 26-27.  Possessing knowledge that an inmate is suffering the effects of a chemical agent and

yet refusing to provide assistance can constitute an Eighth Amendment violation. *See, e.g., El-

Massri v. New Haven Corr. Ctr.,* No. 3:18-CV-1249 (CSH), 2018 WL 4604308, at *8 (D. Conn.

Sept. 25, 2018) (Plaintiff alleged sufficient facts to make out an "unconstitutional conditions of

confinement" claim" by "denying him from washing a harmful, burning chemical from his skin

and eyes" and  "fail[ing] to allow him to shower, with a 'sufficiently culpable' state of mind . . .

35

.") (citing *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002)); *Mago v. Finnucan*, No. 3:20cv1466 (MPS), 2021 WL 171040, at *4 (D. Conn. Jan. 19, 2021) (permitting plaintiff to file amended complaint to "assert facts to state a plausible claim that one or more of the defendants was deliberately or recklessly indifferent to his health in response to his need to be decontaminated from the effects of the chemical agent").  The Court will permit Plaintiff's Eighth Amendment claim for denial of hygiene items to decontaminate himself to proceed for further development of the record.

### b.  *Defendants Does 4 and 5*

Plaintiff alleges that when Officers Does 4 and 5 escorted him from the medical unit to his cell on June 3, 2019, they required him to walk on injured ankles and feet.  He alleges only that the shackles were biting into the back of his ankles and that his feet and ankles were sore. There is no indication that officials in the medical unit found him incapable of walking or too injured to be shackled.

As with respect to his escort to the medical unit, Plaintiff once again fails to plead sufficient facts to show that the intention of Does 4 and 5 in walking him from medical to his cell was malicious or sadistic rather a routine part of his transit "in a good-faith effort to maintain . . . discipline" within the corridors. *Sims*, 230 F.3d at  21. Specifically,  Plaintiff has failed to allege that  defendant Does 4 and 5 were aware that he was at risk of serious harm and disregarded that risk.  Plaintiff's Eighth Amendment claim based on the requirement to walk in restraints from the medical unit to his cell will be dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

However, as to Does 4 and 5, Plaintiff also alleges that when he was placed in his Northern cell, he asked them for clothing, hygiene items, and cleaning supplies.  Doc. 14, ¶ 34.

Although some clothes and a towel were provided by an unidentified person later that day, Plaintiff allegedly received no cleaning supplies. *Id.*

With respect to cleaning supplies and hygiene items, "the inmate must show that the conditions, either alone or in combination, pose[d] an unreasonable risk of serious damage to his health" or safety, which "includes the risk of serious damage to 'physical and mental soundness.'" *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (citing, *inter alia*, *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013)).  Moreover, the inmate must allege that a correction official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both [have been] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also [have] draw[n] the inference." *Darnell*, 849 F.3d at 32.  "[P]rison officials violate the Constitution when they deprive an inmate of his basic human needs such as food, clothing, medical care, and safe and sanitary living conditions." *Walker*, 717 F.3d at 125 (internal quotation marks omitted).

"[U]nsanitary conditions in a prison cell can, in egregious circumstances, rise to the level of cruel and unusual punishment."  *Walker*, 717 F.3d at 127  (citations omitted).  For example, "[c]ausing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted." *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir.1972). However, to determine whether conditions rise to the level of an Eighth Amendment violation depends on the totality of circumstances.  *Davidson v. Murray*, 371 F. Supp. 2d 361, 372 (W.D.N.Y. 2005).

In the case at bar, Plaintiff alleges that he informed Does 4 and 5 that he needed cleaning supplies and hygiene items.  Doc. 14, ¶ 34.  He also alleges that he "was not given any clothing"

and his cell was filthy with fecal matter from a backed-up toilet from an adjoining cell. *Id*. Although he admits he received underwear and a towel within a day, Plaintiff states that he was forced to remain "naked in the cell." *Id.* He does not inform the Court of when/if he ultimately received the requested items. Reading the facts in the light most favorable to Plaintiff, the Court will allow this Eighth Amendment claim to proceed pending further development of the record. If it is later shown that Plaintiff's state of hygiene or the cell's conditions were not sufficiently egregious or were temporary, the claim may be dismissed.[14] *See, e.g., Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir.2003) (although prolonged deprivation of toiletries can violate a prisoner's constitutional rights, a temporary deprivation generally does not) (citations omitted). For the present, this Eighth Amendment claim may proceed against Does 4 and 5, and Plaintiff will be left to his proof.

### c. *Defendant Robles*

Plaintiff contends that defendant Robles violated his Eighth Amendment rights by refusing to help him contact the state police to make a complaint regarding the incident at

---

[14] In general, the "inconvenience or unpleasantness" that a prisoner may endure as a result of "a struggle to get adequate basic toilet items and cleaning supplies" does "not rise to the level of 'unquestioned and serious deprivations of basic human needs' necessary to establish an Eighth Amendment violation." *Davidson v. Murray*, 371 F. Supp. 2d 361, 372 (W.D.N.Y. 2005) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Moreover, courts generally hold that the Eighth Amendment is not violated where an inmate is subjected to unsanitary conditions on a temporary basis. *See, e.g., McNatt v. Unit Manager Parker*, No. 3:99-CV-1397 (AHN), 2000 WL 307000, at *4 (D. Conn. Jan. 18, 2000) (dismissing claims for unclean cell and denial of cleaning supplies for six days and citing cases dismissing short-term exposure to unsanitary conditions); *see also Abreu v. Lake*, No. 9:17-CV-1312 (DNH/DEP), 2018 WL 11236520, at *13 (N.D.N.Y. Jan. 22, 2018) (holding that a twenty-day loss of "showers, hygiene items, and cleaning supplies" amounts to "a temporary deprivation, not a constitutional deprivation necessary to satisfy the objective element of the Eighth Amendment") (citation omitted).

MacDougall.  Prisoners have no "due process right to have correctional staff contact the state police" on their behalf.  *See Ramirez v. Allen*, No. 3:170cv01335(MPS), 2017 WL 4765645, at *11 (D. Conn. Oct. 20, 2017) (dismissing claim that correctional staff failed to contact state police for inmate, where inmate did not allege that he was unable to telephone or write to state police himself).  Indeed, Plaintiff alleges that he spoke to the state police on June 9, 2019.  *See* Doc. 14, ¶ 35.  This claim against defendant Robles will be dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

## C.  ADA & RA Claims against DOC – Accommodation for Mental Illness

In his fourth cause of action, Plaintiff contends that defendant Department of Correction violated his rights under the ADA and RA by failing to make meaningful accommodations to his confinement in light of his mental illness.

The only difference between the ADA and RA is that the RA applies to entities receiving federal financial assistance while the ADA applies to all public entities, a distinction not relevant here.  *See Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 320 & n.13 (D. Conn. 2008).  Because the standards under both statutes are the same, courts treat claims under the ADA and RA identically.  *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. § 12132. To state a cognizable ADA claim, Plaintiff must allege facts establishing three factors: (1) he is a qualified person with a disability, (2) defendants are considered an entity subject to the ADA, and (3) he was denied the opportunity to participate in

or benefit from an institutional program, service, or activity, or otherwise discriminated against because of his disabilities. *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016). "A qualified individual can base a discrimination claim on any of three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (citation and internal quotation marks omitted).

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). "[I]n assessing whether a plaintiff has a disability, courts have been careful to distinguish impairments which merely affect major life activities from those that *substantially limit* those activities." *Troeger v. Ellenville Cent. Sch. Dist.*, 523 F. App'x 848, 852 (2d Cir. 2013) (emphasis added) (quoting *Ryan v. Grae & Rybicki P.C.*, 135 F.3d 867, 870 (2d Cir. 1998)) (internal quotation marks omitted).

In the original complaint, Plaintiff alleged that he suffers from anxiety, PTSD, depression, and paranoia. Doc. 13, at 21-22. Although he stated his belief that the seclusion and lack of stimuli during his confinement exacerbated these conditions, he alleged "no facts showing that his mental impairments substantially limited his major life activities before he was placed in administrative segregation." *Id.* at 22. The Court concluded that Plaintiff "failed to allege facts showing that he is a qualified person with a disability" and, therefore, failed to allege

cognizable ADA and RA claims. *Id*. The Court then informed Plaintiff that he could "reassert these claims against the  Department of Correction in his amended complaint, provided he [could]  allege facts showing that he is a qualified person with a disability." *Id.*

In his Second Amended Complaint, Plaintiff still has not alleged facts describing his mental state prior to confinement in isolation. He once again asserts that he had "mental illness" of "PTSD and depression." Doc. 14, ¶ 35.   However, he describes circumstances during his confinement that suggest he qualified as a  "disabled person" at those times.  For example, Plaintiff describes anxiety attacks, depression, self-mutilation (when held in the shower for more than ten minutes), hallucinations of "creatures and people" in his cell, a need for psychotropic medications, and one instance of hoarding medication to commit suicide. *Id.* ¶¶ 63-64, 103, 108. Accordingly, at the pleading stage, construing the Second Amended Complaint liberally for purposes of initial review, the Court finds Plaintiff to be disabled with respect to his ADA and RA claims.

Next, as to the Department of Correction as the defendant on these claims, the United States Supreme Court has held that the ADA applies to state prisons. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209 (1998) (holding that ADA "unmistakably includes State prisons and prisoners within its coverage").  "[T]he ADA plainly covers state institutions without any exception that could cast the coverage of prisons into doubt." *Id.*  The DOC is thus an entity subject to the ADA.

Plaintiff alleges that the DOC discriminated against him by placing him in prolonged confinement with a mental illness.  He states that such extended isolation was discriminatorily harsh in that the conditions of such confinement exacerbated his mental illness and were thus

more detrimental to him than to prisoners without mental illness.  Doc. 14,  ¶¶ 101-103, 107-08,

146, 154-55.  The Court will permit this claim to proceed for further development of the record.

### D.  First, Fourth, and Fourteenth Amendment Claims

#### 1.  Deliberate Indifference

Although Plaintiff only references the Eighth Amendment in his causes of action, he

states in his introduction that the defendants' actions violated his rights under the First, Fourth,

Eighth, and Fourteenth Amendments.  Doc. 14, ¶ 1.  Plaintiff is a sentenced inmate.  Thus, his

deliberate indifference claims are cognizable under the Eighth Amendment, not under the Fourth

or Fourteenth Amendments.  *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (deliberate

indifference claims of pretrial detainees are cognizable under the Fourteenth Amendment while

claims of sentenced prisoners are cognizable under the Eighth Amendment); *Powell v. Gardner*,

891 F.2d 1039, 1041 (2d Cir. 1989) (noting that Fourth Amendment should apply to conditions

claims post-arrest and pre-arraignment).  Any deliberate indifference claims asserted under the

Fourth or Fourteenth Amendments will be dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

#### 2.  Due Process Claims – Periodic Review and Disciplinary Hearing

In a prior Order addressed to the original Complaint, Judge Covello dismissed Plaintiff's

Fourteenth Amendment procedural due process claim regarding failure of defendants to conduct

meaningful periodic reviews of his Administrative Segregation classification and continued

confinement.  Doc. 13, at 18-19.   The Court reasoned that the claim had previously been

dismissed in another case by Plaintiff for failure to exhaust his administrative remedies before

asserting the claim.  *Id.* That due process claim remains dismissed.

In addition to challenging periodic reviews, Plaintiff now alleges that he was denied due

process at the hearing on the disciplinary report defendant Chevalier issued on October 31, 2019, for Plaintiff's alleged refusal of housing. Doc. 14, ¶¶ 89, 94, 126.  Plaintiff contends that rather than simply refusing housing, he was exercising his rights under Administrative Directive 9.9 to seek protection by expressing his fears for his safety.[15] *Id.* ¶ 94.  Also, according to Plaintiff, Lieutenant Betances, the hearing officer, failed to consider Plaintiff's evidence, *id.* ¶¶ 98, 130; and defendant Leone, the disciplinary investigator, failed to introduce as evidence a transfer sheet showing the names of the inmates to be transferred on that day, *id.* ¶ 95.  Leone also allegedly failed to present three witnesses, who had given statements, regarding Plaintiff's confrontation with defendant Chevalier.  *Id.*

To state a cognizable claim under § 1983 for denial of due process arising out of a disciplinary hearing, Plaintiff must allege facts establishing two elements. *Williams v. Chuttey*, 767 F. App'x 105, 107 (2d Cir. 2019). First, he must show that he "possessed an actual liberty interest." *Id.*  (citing *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004)). Second, he must show that he was "deprived of that interest without being afforded sufficient process."  *Id.*

As to the first element, "to be actionable, the liberty interest must subject the prisoner to 'atypical and significant hardship ... in relation to the ordinary incidents of prison life.'"  *Vega v. Lantz*, 596 F.3d 77, 83 (2d Cir. 2010) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). Regarding the second element, as the hearing at issue was a prison disciplinary hearing, Plaintiff was entitled to the protections set forth in *Wolf v. McDonnell*, 418 U.S. 539 (1974).  Specifically,

---

[15] Administrative Directive 9.9(4), captioned "Threat Notification," provides: "Protective measures for an inmate shall be considered, when it is determined a substantial risk of serious harm to the inmate may exist . . . ."  DOC Admin. Dir. 9.9(4).

Plaintiff was "entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Williams*, 767 F. App'x at 107-08 (citations omitted) (quoting *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004)) (internal quotation marks omitted).

As to the first element, before assessing any defects in the hearing itself, the Court must determine whether Plaintiff has alleged facts to demonstrate that he was denied a protected liberty interest as a result of the hearing. In this claim, Plaintiff challenges the content of the disciplinary hearing but presents no sanction imposed at that hearing. Specifically, he argues that the disciplinary reports ("D.R."s) regarding his refusal of housing should have been dismissed. Doc. 14, ¶ 98. He alleges that Lieutenant Betances had the authority to vacate or dismiss disciplinary reports ("D.R."s). *Id.* He also alleges that following the guilty finding at the hearing, he was regressed in the Administrative Segregation ("A/S") program, such that he was "placed back on [handcuff] restraints" and suffered the "loss of [his] commissary" privileges. *Id.* In short, he asserts that the guilty finding may have "prolonged his stay in the inhumane environment" of A/S. *Id.*

"The Constitution itself does not give an inmate a liberty interest in avoiding more restrictive confinement such as Punitive Segregation or Administrative Segregation." *Ellerbe v. Jasion,* No. 3:12-CV-00580 MPS, 2015 WL 1064739, at *3 (D. Conn. Mar. 11, 2015) (citing *Wilkinson v. Austin,* 545 U.S. 209, 221–22 (2005)). However, state statutes may create a liberty interest if their language unmistakably mandates specific procedural predicates before a

44

particular deprivation is imposed.  *Id.* (citing *Tellier v. Fields*, 280 F.3d 69,81 (2d Cir. 2000)). The Connecticut DOC imposes set terms to place an inmate in the A/S program.  *See* DOC Admin. Dir. 9.4.[16]

To rise to the level of a constitutionally protected liberty interest, a new placement must "impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Wilkinson*, 545 U.S. at 223 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). Also, "the duration of [segregated] confinement is a distinct factor bearing on atypicality and must be carefully considered." *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000).

In the case at bar, however, Plaintiff had already been placed on A/S status at the time of the disciplinary hearing related to the D.R.s issued by Chevalier. Four months before the disciplinary report hearing, on June 14, 2019, "Plaintiff attended the A/S hearing" and thereafter admittedly refused to "participate in or with the A/S program." Doc. 14, ¶¶ 39-41.  The hearing at issue was thus not an  A/S classification hearing and did not impose A/S status as a punishment. Rather, the hearing addressed the D.R.s related to specific alleged misconduct – *i.e.*, Plaintiff's refusal to accept housing.

Here, Plaintiff does not dispute the procedures employed before he was placed in A/S. He admits he refused to participate in the A/S program altogether.  Instead, he contests the

---

[16] Under Administrative Directive 9.4, "[p]lacement of an inmate on Administrative Segregation Status shall be at the discretion of the Director of Offender Classification and Population Management," following a hearing before an Administrative Segregation Hearing Officer who considers classification  assignment after receiving the requisite request by the prison facility's mental health clinician.  DOC Admin. Dir. 9.4 (12)(A)-(E).  Moreover, "[p]rogression through the Administrative Segregation program phases shall be contingent upon successful completion of specific program components in accordance with unit policies."  *Id.* (G).

procedures at the D.R. hearing.

Moreover, Plaintiff has failed to identify any sanctions that were imposed at this D.R.-related hearing. Granted, following a guilty finding on the D.R.s at issue, Plaintiff remained on A/S status and was thereafter  regressed in the A/S program because, as he says, he "made it clear to all administrative . . . DOC that he was not going to participate in the A/S program." Doc. 14, ¶ 89.   His regression was thus a separate classification decision, resulting not from alleged lack of due process regarding the D.R.s but from his admitted refusal to cooperate in the A/S program.

As explained by the Connecticut Supreme Court,  a hearing for a disciplinary violation is not an A/S status hearing:

> [A]lthough a disciplinary violation often is the precipitating event that leads to the review of an inmate's eligibility for administrative segregation status, an administrative segregation hearing is not a disciplinary hearing, and placement in administrative segregation is not a form of punishment; rather, it is a management tool that is used to control inmates who are perceived to present the greatest safety and security threats.

*Vandever v. Comm'r of Correction*, 315 Conn. 231, 236–37 (2014).

 In the present case, there is no indication that either Plaintiff's A/S status or regression was imposed as a sanction or direct punishment for the D.R.s in the hearing at issue.[17]  Any such

---

[17] Furthermore, an inmate's loss of privileges while in administrative segregation has been held not to constitute an  "atypical or significant deprivation" needed to implicate due process liberty interest.  *See, e.g., Sealey v. Coughlin*, 997 F. Supp. 316, 321 (N.D.N.Y. 1998), ("[A]dministrative segregation is the sort of confinement that [the plaintiff] should reasonably anticipate receiving at some point in [his] incarceration.  Moreover, the denial of certain privileges enjoyed by inmates placed in general population fails to identify conditions outside the expected parameters of the sentence imposed by law.") (citations and internal quotation marks omitted), *aff'd sub nom., Sealey v. Giltner*, 197 F.3d 578 (2d Cir. 1999).

decisions were separate determinations. Under these circumstances, despite alleged procedural deficiencies at the D.R.-related hearing, Plaintiff fails to allege a plausible due process claim. *See Wilson v. Connecticut Dep't of Corr.*, No. 3:20cv1567(MPS), 2020 WL 7388979, at *12 (D. Conn. Dec. 16, 2020) (finding no liberty interest where plaintiff-inmate "failed to allege that he received any punitive sanctions as a result of the guilty finding after a disciplinary hearing"). Absent direct loss of an identifiable liberty interest, Plaintiff's due process claim regarding that disciplinary hearing will be dismissed pursuant to 28 U.S.C. § 1915A(b)(1).[18]

### 3. First Amendment Retaliation

Finally, Plaintiff asserts two retaliation claims. In the first claim, Plaintiff alleges generally that the Department of Correction has retaliated against him by issuing disciplinary reports to regress him in the Administrative Segregation phase program because he filed grievances and inmate requests. Doc. 14, ¶ 89. In the second claim, Plaintiff alleges, more specifically, that defendant Chevalier filed the October 31, 2019, disciplinary report, after which Plaintiff was regressed to Phase 1 for refusal to participate in the A/S program.[19] *Id.* ¶¶ 89, 94. The Court considers whether these allegations support a plausible retaliation claim.

To establish a retaliation claim, Plaintiff must allege facts establishing three elements: (1)

---

[18] In contrast, courts may find a violation of a liberty interest when an inmate is placed on A/S status without "*Wolff* procedures during the Administrative Segregation hearing" under Administrative Directive 9.4. *See, e.g., Ellerbe v. Jasion*, No. 3:12-CV-00580 MPS, 2015 WL 1064739, at *5 (D. Conn. Mar. 11, 2015). In such cases, the restrictive confinement imposed must be "atypical."

[19] Plaintiff states that he was regressed to Phase 1 after he had progressed to Phase 2 and been taken off the handcuff restriction. Doc. 14, ¶ 89.

he engaged in protected speech or conduct, (2) the defendant took an adverse action against him, and (3) there was a causal connection between the protected speech and the adverse action. *Burns v. Martuscello*, 890 F.3d 77, 84 (2d Cir. 2018) (citing *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015)).

In his first claim, Plaintiff alleges that he filed inmate requests and grievances, which resulted in retaliation by prison officials. Filing a grievance is protected activity that satisfies the first element of retaliation. *See Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (seeking redress of grievances in judicial or administrative forum is protected activity). However, prisoners pursuing retaliation claims may not rest on "wholly conclusory" allegations, but rather must allege "specific and detailed" supporting facts. *Dolan,* 794 F.3d at 295. Plaintiff merely alleges that correctional staff retaliated against him by issuing disciplinary reports. Absent the names, dates, and actions of specific defendants, this claim is conclusory. Plaintiff's first retaliation claim will be dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

In his second claim, Plaintiff alleges Chevalier was the officer who retaliated against him. However, he identifies his protected conduct as refusing to participate in the Administrative Segregation program, and there are no reported cases finding that refusal to participate in such a program is protected speech or conduct. Thus, this action does not support a plausible retaliation claim. The second retaliation claim will also be dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

## E. Claims for Injunctive Relief

In his description of the parties, Plaintiff sues all but seven of the named individual

defendants for declaratory and/or injunctive relief.[20]   Doc. 14, ¶¶ 118-42.   The Eleventh Amendment does not bar an action against a state official for violation of federal law if the plaintiff seeks an injunction regarding that official's future conduct.   *Edelman v. Jordan*, 415 U.S. 651, 664 (1974). *See also Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989) ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'") (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14 (1985)); *Feng Li v. Rabner*, 643 F. App'x 57, 57-59 (2d Cir. 2016) ("As to the individual defendants, generally, state officials are not immune under the Eleventh Amendment if the 'complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'") (quoting *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002)).

However, the events giving rise to Plaintiff's action occurred from 2019 to 2020, and he is no longer confined in Northern, the facility where the alleged events took place.   As the case docket indicates, Jordan is currently housed in Garner.   "It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility," including the officials employed therein. *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996). *See also Thompson v. Carter,* 284 F.3d 411, 415 (2d Cir. 2002) ("A prisoner's transfer to a different correctional facility generally moots his request for injunctive relief against employees of the transferor facility."); *Young v. Coughlin*, 866 F.2d 567, 568 n.1 (2d Cir. 1989) ("Since Young is

_____

[20] The only defendants in the action not sued for injunctive relief include Cook, Mueller, Frayne, and Does 2-5.

no longer incarcerated at Auburn, but was transferred to Attica Correctional Facility, his claim for declaratory and injunctive relief is moot."), *cert. denied*, 492 U.S. 909 (1989).   Northern officials and employees can provide no prospective relief following Plaintiff's transfer to Garner. Accordingly, all requests by Plaintiff for injunctive relief  against Northern officials and employees will be stricken.

However, although "it is true that a prisoner's transfer from a prison facility moots that prisoner's claim for injunctive relief against the transferring facility[,] . . .  there is an exception to the mootness doctrine for challenged actions that are capable of repetition, yet evading review." *Pugh v. Goord*, 571 F. Supp. 2d 477, 488 (S.D.N.Y. 2008) (citations and internal quotation marks omitted).  This exception is "applied — provided the action is not a class-action lawsuit — if  (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [i]s a reasonable expectation that the same complaining party would be subjected to the same action again." *Id*. (citation and internal quotation marks omitted).

In the present case, defendant Quiros was Deputy Commissioner of the DOC (not simply an employee of Northern) during the events giving rise to Plaintiff's Eighth Amendment claim against him.  Quiros's alleged denial of Plaintiff's appeal regarding A/S placement at Northern in June 2019 was a singular event, Doc. 14, ¶ 46; and Plaintiff is no longer confined at Northern. However, Quiros is now DOC Commissioner and Plaintiff is "still a prisoner at a DOC[ ] facility,"  so that he may remain subject to similar protocols (*e.g*., A/S placement), *Pugh*, 571 F. Supp. 2d at 489. Similarly, Plaintiff's claims against the DOC under the ADA and RA may implicate that defendant's potential to allegedly continue discriminating against Plaintiff with

50

respect to accommodating his mental illness at a DOC facility.  Accordingly, Plaintiff's Eighth Amendment claim for injunctive relief against Quiros in his official capacity and Plaintiff's ADA and RA claims for injunctive relief against the DOC are not moot and will proceed for further development of the record.

## IV. CONCLUSION

Plaintiff's Motion to Amend and/or Correct Amended Complaint [Doc. 14] has been granted so that the Second Amended Complaint is the operative pleading, subject to the rulings below.  *See* Doc. 24.  With respect to relief, to the extent that Plaintiff seeks damages from state officials in their *official* capacity, his § 1983 claims are barred by the Eleventh Amendment and are **DISMISSED**.[21]  Moreover, Plaintiff's transfer from Northern to Garner has mooted his requests for *declaratory and/or injunctive* relief as to all defendant officials and employees of Northern.[22]  Such requests are **stricken** from the Second Amended Complaint.

The case will proceed on Plaintiff's Eighth Amendment claim for prolonged isolation against defendants Bowles, Quiros, Mudano, Cook, Chevalier, Robles, Blackstock, and Mueller. However, this claim is **DISMISSED** against defendants Frayne, Maiga, Baymon, Betances, and Leone.

The Eighth Amendment "conditions of confinement" claims against Does 1-3 for failure

---

[21]  These state officials may be sued on designated plausible claims in their *individual* capacities for damages.

[22]  In contrast, as described above, Plaintiff's Eighth Amendment claim against DOC Commissioner Quiros may proceed against him in both his individual capacity for damages and his official capacity for injunctive relief.

to provide Plaintiff with hygiene items to decontaminate himself from chemical spray and against Does 4-5 for failure to produce cleaning supplies and hygiene items will proceed pending further development of the record.

The Eighth Amendment claims against defendants Does 1-3 for requiring Plaintiff to walk in shackles to the medical unit on May 31, 2019, against Does 4-5 for requiring Plaintiff to walk in shackles from the medical unit to his cell on June 3, 2019, and against defendant Robles for failing to contact state police on Plaintiff's behalf are **DISMISSED** pursuant to 28 U.S.C. §1915A(b)(1).

The ADA and RA claims against the Department of Correction will proceed.

Plaintiff's claims for denial of due process and First Amendment retaliation are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1).

Any residual claims by Plaintiff for denial of equal protection of the laws regarding property, denial of procedural due process, and/or  general violation of the  Eighth Amendment due to general conditions in Administrative Segregation remain  **DISMISSED**.  Doc. 13, at 16-19.  None of these claims are revived by allegations in the Second Amended Complaint.

Furthermore, as to Plaintiff's allegations relating to denial of medical care upon his arrival at Northern, Plaintiff has named no Northern medical staff as defendants in his Second Amended Complaint.  He has thus failed to assert a plausible claim for deliberate indifference to serious medical needs with respect to his arrival.

Plaintiff has failed to identify the following individuals as defendants in his Second Amended Complaint:  Jeannotte, Barone, Mulligan, Supprennant, Monete, Wooten, Nichisti, Bassett, Briatico, Burgos, Acus (listed twice on the docket), Clark, Gonzalez, Saltzmann,

Gifford, Russell, Lamountain, Rivenburgh, Peterson, Brown, Mahaliak, Legassey, Maroscott, Mushi, and Lembrick.   Accordingly, **the Clerk is directed** to terminate each of them as defendants in this case.

In addition, in light of Plaintiff's failure to state any plausible claims against the following defendants, **the Clerk shall** terminate these individuals as well:  Baymon, Maiga, Betances, Leone, Frayne, and Jackson.

The Court enters the following additional orders.

(1)    **The Clerk shall** verify the current work addresses for defendants Bowles, Quiros, Mudano, Cook, Chevalier, Robles, Blackstock, and Mueller with the Department of Correction Office of Legal Affairs, mail a waiver of service of process request packet to them within **twenty-one (21) days** of this Order, and report to the Court on the status of the waiver request on the **thirty-fifth (35th) day** after mailing. If any defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshal Service on that defendant in his/her individual capacity and the defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(2)    **The Clerk shall** prepare a summons form and send an official capacity service packet to the U.S. Marshal Service.  The U.S. Marshal is directed to effect service of the Second Amended Complaint on defendants Department of Correction and Commissioner Quiros at the Office of the Attorney General, 165 Capitol Avenue, Hartford, CT 06106, within **twenty-one (21) days** from the date of this order and to file a return of service within **thirty (30) days** from

the date of this Order.[23]

(3)     **The Clerk shall** send Plaintiff a copy of this Order.

(4)     **The Clerk shall** send a courtesy copy of the Second Amended Complaint and this Order to the Connecticut Attorney General and the Department of Correction Office of Legal Affairs.

(5)     The defendants shall file their response to the Second Amended Complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the waiver forms are sent. If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims indicated in this Order. They may also include all defenses permitted by the Federal Rules.

(6)     Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within **seven months (210 days)** from the date of this Order.  Discovery requests need not be filed with the Court.

(7)     All motions for summary judgment shall be filed within **eight months (240 days)** from the date of this Order.

(8)     Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within **twenty-one (21)** days of the date the motion was filed.  If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

-----

[23] As discussed above, Plaintiff's claims against defendants Bowles, Quiros, Mudano, Cook, Chevalier, Robles, Blackstock, and Mueller may *not* proceed for damages in their *official* capacities due to the Eleventh Amendment. Moreover, claims for declaratory relief against all of these defendants except Quiros and the DOC were mooted upon Plaintiff's transfer from Northern to Garner.

(9)     If Plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)(2) provides that he MUST notify the Court.  Failure to do so may result in the dismissal of the case.  Plaintiff must give notice of any new address even if he is incarcerated. Plaintiff should write "PLEASE NOTE MY NEW ADDRESS" on the notice.  It will not be sufficient to simply include the new address on a letter without indicating that it is a new address. If Plaintiff has more than one pending case, he should indicate all the case numbers in the notification of change of address.  Plaintiff should also notify the defendants or the attorney for the defendants of his new address.

(10)     Plaintiff shall utilize the Prisoner Efiling Program when filing documents with the Court.  Plaintiff is advised that the Program may be used only to file documents with the Court. The Local Court Rules provide that discovery requests are not filed with the Court but must rather be served on defendants' counsel by regular mail.

(11)     **The Clerk shall** immediately enter the District of Connecticut "Standing Order Re: Initial Discovery Disclosures" concerning cases initiated by self-represented inmates and shall send a copy to Plaintiff.

(12)   Service cannot be effected on defendant Does 1-5 without their full names and current work addresses.[24]  Plaintiff is directed to file a notice containing that information within

---

[24] The Court notes that Plaintiff waited nearly three years before filing this action.  The actions of defendant Does 1-3 occurred on May 31, 2019, and the actions of defendant Does 4-5 on June 3, 2019. Plaintiff includes May 17, 2022, in the case caption but does not indicate the date he signed the Complaint.  The Complaint was scanned by prison officials on May 24, 2022, one week before the limitations period expired on the claims against defendant Does 1-3.  *See Thompson v. Rovella*, 734 F. App'x 787, 788-89 (2d Cir. 2018) (in Connecticut, the limitations period to file a section 1983 action is three years).

**thirty (30) days** from the date of this Order.    Failure to do so may result in the dismissal of the

claims against defendants Does 1-5.

It is **SO ORDERED.**

Dated:  New Haven, Connecticut
             March 13, 2023

*/s/Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge

---

It is possible that Plaintiff's claims are time-barred. "John Doe pleadings cannot be used to circumvent statutes of limitations because replacing a John Doe with a named party in effect constitutes a change in the party sued." *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (citing *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1075 (2d Cir.1993)) (internal quotation marks omitted). The only exception to this rule is set forth in Federal Rule of Civil Procedure 15(c), which provides that an amendment relates back to the date of the original complaint if, within the time for service of the original complaint, the newly identified party "(i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c) (1)(C).

The Second Circuit has held that "the lack of knowledge of a John Doe defendant's name does not constitute a 'mistake of identity'" that would support relation back under Rule 15. *Hogan*, 738 F.3d at 518 (quoting *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 470 (2d Cir. 1995)); *see also Abreu v. City of New York*, 657 F. Supp. 2d 357, 363 (E.D.N.Y. 2009) ("[A] plaintiff who 'believe[s] that there exist[ ] individual defendants who [are] potentially liable for his injuries, but [who does] not know their exact identities' and who waits until after the expiration of the limitations period to remedy this lack of knowledge (by naming a specific individual as a defendant), will find his claim time-barred.") (citation omitted); *but see Archibald v. City of Hartford*, 274 F.R.D. 371, 382 (D. Conn. 2011) (permitting replacement of John Doe defendants after limitations period had expired where plaintiff's failure to timely do so was caused by defendants' failure to respond to discovery requests) (citing *Byrd v. Abate*, 964 F. Supp. 140, 146 (S.D.N.Y. 1997)).

The current record contains no information regarding any efforts Plaintiff may have made to determine the names of the John Doe defendants.  Nor is there sufficient information to determine whether the limitations period should be equitably tolled.  Thus, the Court will defer consideration of the statute of limitations defense until after Plaintiff identifies these defendants and they assert the defense.